Opinion by Judge NOONAN; Concurrence by Judge FISHER; Dissent by Judge REINHARDT.
NOONAN, Circuit Judge:
On this appeal from the tax court, we must decide whether, under the tax regulations in effect during tax years 1997, 1998 and 1999, related companies engaged in a joint venture to develop intangible property must include the value of certain stock option compensation one participant gives to its employees in the pool of costs to be shared under a cost sharing agreement, even when companies operating at arm’s length would not do so. The tax court found related companies are not required to share such costs and ruled that the Commissioner of Internal Revenue’s attempt to allocate such costs was arbitrary and capricious. We affirm.
I. BACKGROUND
Xilinx, Inc. (“Xilinx”) researches, develops, manufactures, and markets integrated circuit devices and related development software systems. Xilinx wanted to expand its position in the European market and established Xilinx Ireland (“XI”) in 1994 as an unlimited liability company under the laws of Ireland. XI sold programmable logic devices and conducted research and development (“R & D”). Two wholly owned Irish subsidiaries of Xilinx owned XI during the tax years of 1997, 1998 and 1999, the only years at issue in this appeal.
In 1995, Xilinx and XI entered into a Cost and Risk Sharing Agreement (“the Agreement”), which provided that all right, title and interest in new technology developed by either Xilinx or XI would be jointly owned. Under the Agreement, each party was required to pay a percentage of the total R & D costs in proportion to the anticipated benefits to each from the new technology that was expected to be created. Specifically, the Agreement required the parties to share: (1) direct costs, defined as costs directly related to the R & D *1193 of new technology, including, but not limited to, salaries, bonuses and other payroll costs and benefits; (2) indirect costs, defined as costs incurred by departments not involved in R & D that generally benefit R & D, including, but not limited to, administrative, legal, accounting and insurance costs; and (3) costs incurred to acquire products or intellectual property rights necessary to conduct R & D. The Agreement did not specifically address whether employee stock options (“ESOs”) were a cost to be shared.
Xilinx offered ESOs to its employees under two plans. Under one plan, employees were granted options as part of the employee hiring and retention program. The options were of two varieties: incentive stock options (“ISOs”) and nonstatutory stock options (“NSOs”). Employees could exercise these options two ways: (1) by purchasing the stock at the market price on the day the option was issued (“exercise price”) regardless of its then-current market price or (2) by simultaneously exercising the option at the exercise price and selling it at its then-current price, pocketing the difference. Under the other plan, employees could acquire employee stock purchase plan shares (“ESPPs”) by contributing to an account through payroll deductions and purchasing stock at 85 percent of either its exercise price or its market price on the purchase date. Employees must always pay taxes on NSOs, see 26 U.S.C. § 83, but have to pay taxes on ISOs and ESPPs only if they sell acquired stock shares before a specified waiting period has expired (“a disqualifying disposition”), see 26 U.S.C. § 421(b). In determining the R & D costs to be shared under the Agreement for tax years 1997, 1998 and 1999, Xilinx did not include any amount related to ESOs.
In tax years 1997, 1998 and 1999, Xilinx deducted as business expenses under 26 U.S.C. §§ 83 and 162 approximately $41,000,000, $40,000,000 and $96,000,000, respectively, based on its employees’ exercises of NSOs or disqualifying dispositions of ISOs and ESPPs.[1] It also claimed an R & D credit under 26 U.S.C. § 41 for wages related to R & D activity, of which approximately $34,000,000, $23,000,000 and $27,000,000 in the respective tax years were attributable to exercised NSOs or disqualifying dispositions of ISOs and ESPPs.[2] Furthermore, in 1996 Xilinx and XI entered into two agreements that allowed XI employees to acquire options for Xilinx stock. Both agreements provided XI would pay Xilinx for the “cost” of the XI employees’ exercise of the stock options, which was to equal the stock’s market price on the exercise date minus the exercise price. In the 1997, 1998 and 1999 tax years, XI paid Xilinx $402,978, $243,094 and $808,059, respectively, under these agreements.
The Commissioner of Internal Revenue (“Commissioner”) issued notices of deficiency against Xilinx for tax years 1997, 1998 and 1999, contending ESOs issued to its employees involved in or supporting R & D activities were costs that should have been shared between Xilinx and XI under the Agreement. Specifically, the Commis *1194 sioner concluded the amount Xilinx deducted under 26 U.S.C. § 83(h) for its employees’ exercises of NSOs or disqualifying dispositions of ISOs and ESPPs should have been shared. By sharing those costs with XI, Xilinx’s deduction would be reduced, thereby increasing its taxable income. The Commissioner’s determination resulted in substantial tax deficiencies and accuracy-related penalties under 26 U.S.C. § 6662(a).
Xilinx timely filed suit in the tax court. The tax court denied cross motions for summary judgment. After a bench trial, the tax court found that two unrelated parties in a cost sharing agreement would not share any costs related to ESOs. After assuming ESOs were costs for purposes of 26 C.F.R. § 1.482-7A(d)(1), the tax court then found 26 C.F.R. § 1.482-1(b)(1)— which requires cost sharing agreements between related parties to reflect how two unrelated parties operating at arm’s length would behave — dispositive and concluded the Commissioner’s allocation was arbitrary and capricious because it included the ESOs in the pool of costs to be shared under the Agreement, even though two unrelated companies dealing with each other at arm’s length would not share those costs.
The Commissioner timely appealed. On appeal, the parties focused primarily on whether the requirement in 26 C.F.R. § 1.482-7A(d)(1) that “all costs” be shared between related parties in a cost sharing agreement or whether the controlling requirement was 26 C.F.R. § 1.482-1(b)(1) that all transactions between related parties reflect what two parties operating at arm’s length would do. After oral argument, we requested supplemental briefing on whether ESOs were “costs” and whether they were “related to” the intangible product development for purposes of 26 C.F.R. § 1.482-7A(d)(1), and whether a literal application of 26 C.F.R. § 1.482-7A(d)(l) would conflict with a tax treaty between the United States and Ireland that was in effect during the 1998 and 1999 tax years.
II. STANDARD OF REVIEW
“Decisions of the tax court are reviewed on the same basis as decisions from civil bench trials in the district court.” DHL Corp. v. Comm’r, 285 F.3d 1210, 1216 (9th Cir.2002). “Thus, we review the tax court’s conclusions of law de novo and its factual findings for clear error.” Id.
III. DISCUSSION
The Commissioner does not dispute the tax court’s factual finding that unrelated parties would not share ESOs as a cost. Instead, the Commissioner maintains ESOs are a cost that must be shared under § 1.482-7A(d)(1), even if unrelated parties would not share them.
Ambiguity. Congress has authorized the Secretary of the Treasury to allocate income and deductions among related business entities to prevent tax avoidance.
In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer *1195 or license shall be commensurate with the income attributable to the intangible.
26 U.S.C. § 482. The Secretary in turn promulgated regulations authorizing the Commissioner to allocate income and deductions among related entities. The introduction to these regulations explains:
The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. This section sets forth general principles and guidelines to be followed under section 482.
26 C.F.R. § 1.482-l(a)(l).[3] The next subsection states that the standard to be employed “in every case” to ensure taxpayers accurately reflect income from controlled transactions and do not avoid taxes through such transactions is an arm’s length standard:
In determining the true taxable income of a controlled taxpayer, the standard to be applied in every ease is that of a taxpayer dealing at arm’s length with an uncontrolled taxpayer. A controlled transaction meets the arm’s length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm’s length result). However, because identical transactions can rarely be located, whether a transaction produces an arm’s length result generally will be determined by reference to the results of comparable transactions under comparable circumstances.
26 C.F.R. § 1.482 — 1(b)(1).
Another section, however, specifically governing cost sharing agreements between controlled parties to develop intangible property, authorizes the Internal Revenue Service “to make each controlled participant’s share of the costs (as determined under paragraph (d) of this section) of intangible development under the qualified cost sharing arrangement equal to its share of reasonably anticipated benefits attributable to such development....” 26 C.F.R. § 1.482-7A(a)(2). Controlled participants, under paragraph (d) of § 1.482-7A, must include “all” costs in the pool of costs to be shared proportionally (the “all costs requirement”):
For purposes of this section, a controlled participant’s costs of developing intangibles for a taxable year mean all of the costs incurred by that participant related to the intangible development area, plus all of the cost sharing payments it makes to other controlled and uncontrolled participants, minus all of the cost sharing payments it receives from other controlled and uncontrolled participants. Costs incurred related to the intangible development area consist of: operating expenses, as defined in § 1.482 — 5(d)(3), other than depreciation or amortization expense, plus (to the extent not included in such operating expenses, as defined in § 1.482-5(d)(3)) the charge for the use of any tangible property made available to the qualified cost sharing arrangement.
26 C.F.R. § 1.482-7A(d)(1). “Operating expenses” are defined as “includ[ing] all expenses not included in cost of goods sold except for interest expense, foreign income *1196 taxes, domestic income taxes, and any other expenses not related to the operation of the relevant business activity.” 26 C.F.R. § 1.482 — 5(d)(3). How these various provisions interact is the crux of the parties’ dispute.
Section 1.482 — 1(b)(1) specifies that the true taxable income of controlled parties is calculated based on how parties operating at arm’s length would behave. The language is unequivocal: this arm’s length standard is to be applied “in every case.” In the context of cost sharing agreements, this rule would require controlled parties to share only those costs uncontrolled parties would share. By implication, costs that uncontrolled parties would not share need not be shared. In contrast, § 1.482-7A(d)(1) specifies that controlled parties in a cost sharing agreement must share all “costs ... related to the intangible development area,” and that phrase is explicitly defined to include virtually all expenses not included in the cost of goods. The plain language does not permit any exceptions, even for costs that unrelated parties would not share. Each provision’s plain language mandates a different result. Accordingly, we conclude that when related to each other, the two provisions establish an ambiguous standard for determining which costs must be shared between controlled parties in cost sharing agreements specifically related to intangible product development.
Given the resultant ambiguity, our choice is to:
1. Apply a rule of thumb: the specific controls the general.
2. Resolve the ambiguity based on the dominant purpose of the regulations.
The first alternative is a simple solution. It is plausible. But it is wrong. It converts a canon of construction into something like a statute.
Often the specific controls the general. This rule has been used by the Supreme Court. E.g., Long Island Care At Home, Ltd. v. Coke, 551 U.S. 158, 127 S.Ct. 2339, 2348, 168 L.Ed.2d 54 (2007). Apply this simple rule here, and section 1.482-7A(d)(1) controls. The conflict dissolves. The Commissioner is vindicated.
This simple solution is all too pat. It gives controlling importance to a single canon of construction. But, as every judge knows, the canons of construction are many and their interaction complex. The canons “are not mandatory rules.” Chickasaw Nation v. United States, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). They are guides “designed to help judges determine the Legislature’s intent.” Id. They can be “overcome” by “other circumstances” manifesting that intent. Id. The canons are “tools designed to help courts better determine what Congress intended, not to lead courts to interpret the law contrary to that intent.” Scheidler v. National Org. of Women, Inc., 547 U.S. 9, 23, 126 S.Ct. 1264, 164 L.Ed.2d 10 (2006). In the light of these principles, two considerations show the Commissioner’s position to be untenable.
Purpose. Purpose is paramount. The purpose of the regulations is parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions. The regulations are not to be construed to stultify that purpose. If the standard of arm’s length is trumped by 7(d)(1), the purpose of the statute is frustrated. If Xilinx cannot deduct all its stock option costs, Xilinx does not have tax parity with an independent taxpayer.
Treaties. The “arm’s length” standard used in the United States Ireland Tax Treaty RIA Int. Tax Treaty 3057, aids in understanding the mind and practice of the Treasury. A tax treaty is negotiated by the United States with the active participation of the Treasury. The Treasury’s reading of the treaty is “entitled to great weight.” United States v. Stuart, 489 U.S. *1197 353, 369, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (quoting Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-185, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982)). Simultaneous with the signing of the treaty into law, the Treasury issued its “Technical Explanation.” As to Article 9, the Explanation reads:
This article incorporates in the Convention the arm’s length principle reflected in the U.S. domestic transfer pricing provision, particularly Code section 482.
Department of the Treasury Technical Explanation of the 1997 United States-Ireland Tax Treaty, RIA Int. Tax Treaty 3095. See also, e.g., United States-France, Article 9 (RIA Int. Tax Treaty 2225); United States-Germany, Article 9 (RIA Int. Tax Treaty 1542); and United States-United Kingdom, Article 9 (RIA Int. Tax Treaty 2546).
We do not, however, need to decide in this ease whether the treaty obligations “constitute binding federal law enforceable in United States courts.” Medellin v. Texas, 552 U.S. 491, 128 S.Ct. 1346, 1356, 170 L.Ed.2d 190 (2008). It is enough that our foreign treaty partners and responsible negotiators in the Treasury thought that arm’s length should function as the readily understandable international measure.
The judgment of the tax court is AFFIRMED.

. Under 26 U.S.C. § 162(a)(1), employers may deduct from their taxable income "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered.” Under 26 U.S.C. § 83(h), employers may deduct under § 162 the value of any property transferred to an employee in connection with the performance of employment.

. Under 26 U.S.C. § 41(b)(2)(A), companies can claim a tax credit for "wages paid or incurred to an employee for qualified [research] services performed by such employee.”

. Controlled taxpayer is defined as "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers.” 26 C.F.R. § 1.482-l(i)(5).