**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMAZON.COM, INC. & SUBSIDIARIES, *Petitioner-Appellee*, | No. 17-72922 |
| | Tax Ct. No. 31197-12 |
| v. | |
| COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellant*. | OPINION |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted April 12, 2019
Seattle, Washington

Filed August 16, 2019

Before: William A. Fletcher, Consuelo M. Callahan,
and Morgan Christen, Circuit Judges.

Opinion by Judge Callahan

# SUMMARY[*]

## Tax

The panel affirmed the Tax Court's decision on a petition for redetermination of federal income tax deficiencies, in an appeal involving the regulatory definition of intangible assets and the method of their valuation in a cost-sharing arrangement.

In the course of restructuring its European businesses in a way that would shift a substantial amount of income from U.S.-based entities to the European subsidiaries, appellee Amazon.com, Inc. entered into a cost sharing arrangement in which a holding company for the European subsidiaries made a "buy-in" payment for Amazon's assets that met the regulatory definition of an "intangible." *See* 26 U.S.C. § 482. Tax regulations required that the buy-in payment reflect the fair market value of Amazon's pre-existing intangibles. After the Commissioner of Internal Revenue concluded that the buy-in payment had not been determined at arm's length in accordance with the transfer pricing regulations, the Internal Revenue Service performed its own calculation, and Amazon filed a petition in the Tax Court challenging that valuation.

At issue is the correct method for valuing the pre-existing intangibles under the then-applicable transfer pricing regulations. The Commissioner sought to include all intangible assets of value, including "residual-business assets" such as Amazon's culture of innovcation, the value

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of workforce in place, going concern value, goodwill, and growth options. The panel concluded that the definition of "intangible" does not include residual-business assets, and that the definition is limited to independently transferrable assets.

## COUNSEL

Judith A. Hagley (argued), Gilbert S. Rothenberg, and Arthur T. Catterall, Attorneys, Tax Division; Richard E. Zuckerman, Principal Deputy Assistant Attorney General; Travis A. Greaves, Deputy Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellant.

Carter G. Phillips (argued), Joseph R. Guerra, and Matthew D. Lerner, Sidley Austin LLP, Washington, D.C.; David R. Carpenter, Sidley Austin LLP, Los Angeles, California; for Petitioner-Appellee.

Christopher J. Walker, The Ohio State University Moritz College of Law, Columbus, Ohio; Steven P. Lehotsky, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae The Chamber of Commerce of the United States of America.

Elizabeth J. Stevens, Caplin & Drysdale, Chartered, Washington, D.C., for Amici Curiae H. David Rosenbloom and John P. Steines, Jr.

Alice E. Loughran, Charles G. Cole, Michael C. Durst, and Robert J. Kovacev, Steptoe & Johnson LLP, Washington D.C., for Amici Curiae Semiconductor Industry Association, Information Technology Industry Council, National Foreign

Trade Council, Software Finance and Tax Executives Council, and TechNet.

A. Duane Webber, George M. Clarke, and Phillip J. Taylor, Baker & McKenzie LLP, Washington, D.C.; Mark A. Oates, Susan E. Ryba, and Cameron C. Reilly, Baker & McKenzie LLP, Chicago, Illinois; Scott H. Frewing, Baker & McKenzie LLP, Palo Alto, California; for  Amici Curiae Silicon Valley Tax Directors Group, Agilent Technologies, Inc., Cisco Systems, Inc., Dell Technologies Inc., Dolby Laboratories, Inc., Expedia Group, Inc., FireEye, Inc., Genesys Int'l Corp. Ltd., Informatica, Inc., NetApp, Inc., Palo Alto Networks, Inc., Surveymonkey Inc., and VMware, Inc.

---

**OPINION**

CALLAHAN, Circuit Judge:

Appellee, Amazon.com, Inc., is a U.S.-based online retailer with highly profitable intangible assets.  In 2005 and 2006, Amazon restructured its European businesses in a way that would shift a substantial amount of its income from U.S.-based entities to newly created European subsidiaries. Because the restructuring would allow the European entities to generate income using Amazon's pre-existing intangible assets developed in the United States, the tax code and corresponding regulations required that the European entities compensate Amazon for the use of assets that meet the regulatory definition of an "intangible."

The compensation was provided through a cost sharing arrangement, whereby Amazon and a holding company for the European subsidiaries would be treated as co-owners of

the intangibles.    Under the arrangement, the holding company was required to make a "buy-in" payment for the pre-existing intangibles Amazon contributed to the arrangement and to make cost sharing payments going forward for its share of future research and development (R&D) efforts.  The buy-in payment was taxable income to Amazon, and the holding company's cost sharing payments would reduce Amazon's U.S. tax deductions for R&D costs.

To guard against manipulation by jointly controlled entities, the regulations require that the buy-in payment reflect the fair market value of the pre-existing intangibles made available under a cost sharing arrangement.  Amazon initially reported a buy-in payment of about $255 million. Appellant, the Commissioner of Internal Revenue, concluded that the buy-in payment had not been determined at arm's length in accordance with the transfer pricing regulations, so the IRS performed its own calculation, valuing the buy-in at about $3.6 billion.  Amazon filed a petition in the United States Tax Court challenging the IRS's valuation.

In the tax court proceedings, Amazon and the Commissioner offered competing methods for valuing Amazon's pre-existing intangibles.    There was a key difference between the parties' respective approaches. Amazon's methodology isolated and valued only the specific intangible assets that it transferred to the European holding company under the cost sharing arrangement, including website technology, trademarks, and customer lists.  The Commissioner's methodology essentially valued the entire European business, minus pre-existing tangible assets.  That method necessarily swept into the calculation all contributions of value, including those that are more nebulous and inseparable from the business itself, like the

value of employees' experience, education, and training (known as "workforce in place"), going concern value, goodwill, and other unique business attributes and expectancies (which the parties refer to as "growth options"). The tax court sided primarily with Amazon, and the Commissioner appealed.

This case requires us to interpret the meaning of an "intangible" in the applicable (but now outdated) transfer pricing regulations.[1]  The case turns on whether, as the Commissioner argues, the regulatory definition is broad enough to include all intangible assets of value, even the more nebulous ones that the Commissioner refers to as "residual-business assets" (i.e., Amazon's culture of innovation, the value of workforce in place, going concern value, goodwill, and growth options). We conclude that the definition does not include residual-business assets. Although the language of the definition is ambiguous, the drafting history of the regulations shows that "intangible" was understood to be limited to independently transferrable assets. We thus affirm.

---

[1] This case is governed by regulations promulgated in 1994 and 1995. In 2009, more than three years after the tax years at issue here, the Department of Treasury issued temporary regulations broadening the scope of contributions for which compensation must be made as part of the buy-in payment. *See* 74 Fed. Reg. 340 (Jan. 5, 2009). In 2017, Congress amended the definition of "intangible property" in 26 U.S.C. § 936(h)(3)(B) (which is incorporated by reference in 26 U.S.C. § 482). Tax Cuts and Jobs Act of 2017, Pub. L. 115-97, § 14221(a), 131 Stat. 2054, 2218 (2017). If this case were governed by the 2009 regulations or by the 2017 statutory amendment, there is no doubt the Commissioner's position would be correct.

## I.

Before summarizing Amazon's corporate restructuring and the procedural history of this case, we first provide an overview of the statutory and regulatory framework for transfer pricing.

## A.

When a taxpayer sells or licenses its property, including intangible assets, to another entity, the purchase price or license royalty is taxable income. Often, such transactions occur between entities "owned or controlled directly or indirectly by the same interests." 26 U.S.C. § 482.[2] The parties in a controlled transaction are in a position to potentially manipulate the terms of the transaction to minimize taxable income artificially. But section 482 gives the Department of the Treasury the power to reallocate the dollar figures of such controlled transactions if necessary "to prevent evasion of taxes or clearly to reflect the income of" a taxpayer. *Id.*; *see also Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972) ("[Section] 482 is designed to prevent 'artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises.'" (quoting B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders p. 15–21 (3d ed. 1971)).

The implementing regulations state that "[t]he purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions."

---

[2] Unless otherwise indicated, references to section 482 of the Internal Revenue Code and the implementing regulations are to the versions in effect during the tax years at issue here (2005 and 2006).

Treas. Reg. § 1.482-1(a)(1). A reallocation under section 482 and the implementing regulations is intended to "place[] a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer." *Id.* The true taxable income is determined as if the parties to the controlled transaction had conducted their affairs in the manner of unrelated parties "dealing at arm's length." Treas. Reg. § 1.482-1(b)(1). The "arm's length" standard is met "if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances." *Id.*

The key regulations were promulgated in 1994 and 1995. The regulations divide property into two categories: tangible property (Treas. Reg. § 1.482-3) and intangible property (Treas. Reg. § 1.482-4). This case concerns intangible property. The regulations provide:

> (b) Definition of intangible. For purposes of section 482, an intangible is an asset that comprises any of the following items and has substantial value independent of the services of any individual—
>
>> (1) Patents, inventions, formulae, processes, designs, patterns, or know-how;
>>
>> (2) Copyrights and literary, musical, or artistic compositions;
>>
>> (3) Trademarks, trade names, or brand names;

(4) Franchises, licenses, or contracts;

(5) Methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, estimates, customer lists, or technical data; and

(6) Other similar items. For purposes of section 482, an item is considered similar to those listed in paragraph (b)(1) through (5) of this section if it derives its value not from its physical attributes but from its intellectual content or other intangible properties.

Treas. Reg. § 1.482-4(b).

A controlled taxpayer may make its intangibles available to a foreign affiliate by entering a licensing agreement, under which the foreign affiliate's royalty fee is taxable income to the controlled taxpayer. *See generally* Treas. Reg. §§ 1.482-1, 1.482-4. The royalty fee must, of course, reflect the "arm's length" value of the license. As new intangibles continue to be developed, the value of the license changes and becomes open to dispute for tax purposes on an ongoing basis.

As an alternative to licensing, the regulations authorize jointly controlled entities to enter a cost sharing arrangement, under which they become co-owners of intangibles developed as a result of the entities' joint R&D

efforts.  *See generally* Treas. Reg. § 1.482-7A.[3]  This arrangement provides the taxpayer the benefit of certainty because, assuming the arrangement satisfies the requirements of the regulations, new intangibles need not be valued as they are developed.

Under the regulations, a subsidiary that enters a cost sharing arrangement with its parent must make two distinct payments.  First, the subsidiary must make an arm's length "buy-in" payment reflecting the value of the pre-existing intangibles the parent contributes to the arrangement:

> If a controlled participant makes pre-existing intangible property in which it owns an interest available to other controlled participants for purposes of research in the intangible development area under a qualified cost sharing arrangement, then each such other controlled participant must make a buy-in payment to the owner.

Treas. Reg. § 1.482-7A(g)(2).  The buy-in payment is taxable income for the entity contributing the intangibles—here, Amazon.

Second, the subsidiary must pay a share of the intangible development costs (or R&D) "equal to its share of reasonably anticipated benefits attributable to such development."  Treas. Reg. § 1.482-7A(a)(2).  If the controlled taxpayer incurs the lion's share of the intangible development costs, the subsidiary is required to make cost

---

[3] We follow the parties' convention of referring to the regulations on cost sharing arrangements by reference to the numbering as redesignated in 2009 (i.e., Treas. Reg. § 1.482-7A).

sharing payments to reflect its share of the anticipated benefits. The subsidiary's cost sharing payments serve to reduce the deductions the controlled taxpayer can take for R&D costs (thereby increasing tax liability).

### B.

Amazon is an online retailer that began operating in the United States in 1995. In the late 1990s and early 2000s, Amazon expanded operations into France, Germany, and the United Kingdom. Amazon's business in Europe had a siloed structure, with separate European subsidiaries independently operating and managing the business, each subsidiary having its own website, fulfillment centers, and customer base. The European subsidiaries licensed the right to use Amazon's website technology, customer information, and marketing intangibles (including trademarks and domain names).

To address operational inefficiencies in Europe, in the early 2000s Amazon investigated options for creating a centralized European headquarters. Amazon ultimately located its new headquarters in Luxembourg, which offered a central location, the lowest value-added tax rate in Europe, and a relatively low corporate tax rate. Beginning in 2004, Amazon undertook a series of transactions to implement its plan for centralizing business operations in Europe.

Amazon formed Amazon Europe Holding Technologies SCS ("AEHT") and transferred to AEHT the pre-existing European subsidiaries, their operating assets, and their pre-existing intangible rights (i.e., those developed in Europe). Amazon and AEHT also entered a cost sharing

arrangement—the transaction most pertinent to this appeal.[4] For the arrangement to be a "qualified cost sharing arrangement" under the transfer pricing regulations outlined above, AEHT needed to pay Amazon for the pre-existing intangibles Amazon contributed to the arrangement. To determine the amount of this "buy-in," Amazon hired a tax firm, which concluded the pre-existing intangibles were worth $217 million.[5]

Under the cost sharing arrangement, AEHT also makes cost sharing payments to Amazon for its share of ongoing intangible development costs. Amazon reported cost sharing payments from AEHT of about $116 million for 2005 and about $77 million for 2006.

The IRS rejected Amazon's calculation of AEHT's buy-in, concluding that Amazon grossly undervalued the intangibles Amazon made available to AEHT. Applying a discounted-cash-flow valuation methodology, the IRS determined a buy-in payment of $3.6 billion.[6] Amazon filed a petition in the tax court challenging the IRS's valuation. Amazon argued that the cost sharing arrangement covered

---

[4] The following transactions were also part of the restructuring: (1) Amazon granted AEHT a license to use Amazon's existing technology-related intellectual property; (2) Amazon assigned to AEHT customer data and certain marketing intangibles (including trademarks, website content, and domain names) relating to the European business; (3) Amazon transferred the stock of the European subsidiaries to AEHT; (4) Amazon transferred other business assets (other than intellectual property) to AEHT; and (5) the pre-existing European subsidiaries licensed to AEHT intellectual property titled in their names.

[5] The tax firm set the buy-in price at $254.5 million, to be paid over a seven-year period (resulting in a present value of $217 million).

[6] The IRS's calculation was later reduced to $3.468 billion.

three distinct groups of transferred assets—website technology, marketing intangibles, and European-customer information—that must be valued separately using a methodology referred to in the transfer pricing regulations as the comparable uncontrolled transaction method.

After a six-week trial that included testimony and written reports of thirty expert witnesses, the tax court concluded that the Commissioner abused his discretion in determining that the discounted cash flow methodology supplied the best method for determining an arm's length buy-in payment and in determining that the required payment is $3.468 billion. *Amazon.Com, Inc. v. Comm'r*, 148 T.C. 108, 150 (2017). Relying on the rationale of its prior decision in *Veritas Software Corp. v. Commissioner*, 133 T.C. 297 (2009), *nonacq.*, 2010-49 I.R.B (2010), *action on dec.*, 2010-05 (Nov. 12, 2010), the tax court reasoned that the Commissioner's valuation methodology "is based in essence on an 'akin to a sale' theory" and "necessarily sweeps into [the] calculation assets that were not transferred under the [cost sharing arrangement] and assets that were not compensable 'intangibles' to begin with." *Amazon.Com*, 148 T.C. at 156–57. The tax court concluded that "[a]n enterprise valuation of a business," like the one conducted by the Commissioner's primary expert, "includes many items of value that are not 'intangibles'" under the cost sharing regulations. *Id.* at 157. Such items include "workforce in place, going concern value, goodwill, and what trial witnesses described as 'growth options' and corporate 'resources' or 'opportunities.'" *Id.* The tax court reasoned that such items are "[u]nlike the 'intangibles' listed

in the statutory and regulatory definitions" in that they "cannot be bought and sold independently." *Id.*[7]

The tax court adopted the comparable uncontrolled transaction method as the best way to value the buy-in payment because that method allows for the intangibles at issue to be isolated and separately valued. *Id.* at 164. Although the tax court agreed with Amazon's general valuation approach, it disagreed with certain aspects of Amazon's implementation of that method. *Id.* After making adjustments, the tax court calculated the value of the buy-in payment to be about $779 million. The Commissioner timely appealed, challenging the tax court's rejection of his expert's discounted cash flow methodology.[8]

## II.

The tax court had jurisdiction over this action under 26 U.S.C. § 6213(a). We have jurisdiction under 26 U.S.C. § 7482(a)(1), (b)(1).

"[W]e review the tax court's conclusions of law de novo and its factual findings for clear error." *MK Hillside*

---

[7] The tax court made several other legal conclusions and factual findings not relevant to the Commissioner's appeal.

[8] Although we affirm the tax court, nothing in our decision should be construed as an outright rejection of any particular valuation methodology. Here, the parties' respective valuation methods did not differ only in how they valued Amazon's assets; they differed in *what* assets they valued. The selection of the "best method" here, *see* Treas. Reg. § 1.482-1(c), thus turns on an interpretation of the regulatory definition of an "intangible." Nothing in our opinion should be construed as favoring one valuation method over another in circumstances not present here.

*Partners v. Comm'r*, 826 F.3d 1200, 1203 (9th Cir. 2016) (quoting *DHL Corp. & Subsidiaries v. Comm'r*, 285 F.3d 1210, 1216 (9th Cir. 2002)).

## III.

The dispositive issue in this case is whether, under the 1994/1995 regulations, the "buy-in" required for "pre-existing intangible property" must include compensation for residual-business assets.[9]  To answer this legal question, we consider the regulatory definition of an "intangible," the overall transfer pricing regulatory framework, the rulemaking history of the regulations, and whether the Commissioner's position is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997).  We agree with the tax court that the definition of an "intangible" in § 1.482-4(b) was *not* intended to embrace residual-business assets.

## A.

The Commissioner argues that Amazon's valuable residual-business assets meet "§ 1.482-4(b)'s definition of intangibles."  "Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction."  *Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015); *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (recognizing that "all the 'traditional tools' of construction" are the same for both statutes and regulations

---

[9] The Commissioner also challenges some of the tax court's other reasons for rejecting the valuation conducted by the Commissioner's expert.  But in each of his other challenges, the Commissioner's argument assumes he is correct on his primary contention that the definition of "intangible" in the 1994/1995 regulations embraces residual-business assets.  Because we reject the Commissioner's view on the primary issue, we need not address his other contentions.

(quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984))).  Our "legal toolkit" includes careful examination of "the text, structure, history, and purpose of a regulation."  *Kisor*, 139 S. Ct. at 2415.

We begin with the language of § 1.482-4(b).  If the regulation is unambiguous, its plain meaning governs.  *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1097 (9th Cir. 2007).

The regulation defines an "intangible" as an asset that both "has substantial value independent of the services of any individual" and is one of the items listed in subsection (b)(1)–(6).  Treas. Reg. § 1.482-4(b).  Each of the 28 specific items in subsection (b) is independently transferrable—none is a residual-business asset.  The Commissioner thus relies on the catchall provision for "[o]ther similar items."  Treas. Reg. § 1.482-4(b)(6).  "[A]n item is considered similar" to the other items in the subsection "if it derives its value not from its physical attributes but from its intellectual content or other intangible properties."  *Id.*

Reading the catchall provision together with the introductory language of the definition, residual-business assets are intangibles if they (1) have substantial value independent of the services of any individual and (2) derive their value from intellectual content or other intangible properties.  The Commissioner argues both elements are satisfied.  First, he argues that Amazon's growth options "derive their value from intangible, rather than physical, attributes."  He then cites testimony from Amazon's expert (Dr. Bradford Cornell) that Amazon's growth options are primarily attributable to its culture of innovation.  Second, he argues that the value of Amazon's growth options is independent of the services of any individual because they

are "part of the culture of Amazon to be able to have creative ideas bubble up in their organization and actually use them."

Amazon argues that the Commissioner's interpretation of the catchall provision is too sweeping for several reasons. Amazon's central argument is that to qualify as an "intangible" under the regulation, an item must be capable of being bought and sold independently of the business—and residual-business assets are inseparable from the business. The tax court agreed. *See Amazon.Com*, 148 T.C. at 157 (concluding that, unlike the specific intangibles listed in the regulation, "workforce in place, going concern value, goodwill, and what trial witnesses described as 'growth options' and corporate 'resources' or 'opportunities' . . . cannot be bought and sold independently").

Amazon offers several arguments in support of its position that assets that are inseparable from the business do not meet the regulatory definition of an "intangible." Quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 78 (1990), Amazon argues that the Commissioner's interpretation renders the "enumeration of specific subjects entirely superfluous—in effect adding to that detailed list 'or anything else.'" Amazon invokes the canon *ejusdem generis*—of the same kind or class—and asserts that "[t]he common attribute of all 28 specified items is that they can be sold independently." Amazon argues this canon should be applied to prevent the catchall clause from swallowing the preceding language of the regulation.

Amazon's focus on the commonality of the 28 specified items has some force. After all, if all 28 listed items share a common attribute, why would anyone understand a catchall for "similar items" to include a non-listed item that doesn't share that attribute? Amazon's commonality argument falters, however, because the catchall provision did not

simply say "[o]ther similar items." Instead, the catchall elaborated by explaining how an item is determined to be "similar" to the other items: "if it derives its value not from its physical attributes but from its intellectual content or other intangible properties." Treas. Reg. § 1.482-4(b)(6). This explanation of what is "similar" leaves open the possibility of a non-listed item being included in the definition even if it doesn't share the attribute of being separately transferrable.

Amazon also argues that the regulation's requirement that an intangible have "substantial value independent of the services of any individual," Treas. Reg. § 1.482-4(b), supports its position. The tax court in *Veritas* agreed. In that case, the tax court rejected the Commissioner's argument that a foreign subsidiary's buy-in under a cost sharing arrangement must include the value of the subsidiary's access to the U.S. corporate parent's R&D and marketing teams—i.e., workforce in place. *Veritas*, 133 T.C. at 323. Although the court found insufficient evidence that the cost sharing arrangement made such a transfer, it also stated that "[e]ven if such evidence existed, these items would not be taken into account in calculating the requisite buy-in payment because they do not have 'substantial value independent of the services of any individual' and thus do not meet the" definition of "intangible." *Id.* at 323 n.31 (quoting Treas. Reg. § 1.482-4(b)). The court reasoned that the value of access to the parent's "R&D and marketing teams is based primarily on the services of individuals (i.e., the work, knowledge, and skills of team members)." *Id.* The Commissioner clearly disagrees with *Veritas* on this point, but he doesn't explain why the tax court's analysis is wrong.

Analysis of the regulatory text alone does not definitively resolve the question here. The definition of an

"intangible" is susceptible to, but does not compel, an interpretation that embraces residual-business assets. The problem is that residual-business assets, such as "growth options" and a "culture of innovation," are amorphous, and it's not self-evident whether such assets have "substantial value independent of the services of any individual." *See* Treas. Reg. § 1.482-4(b). Amazon raises legitimate concerns about the regulation's catchall being stretched too far, and those concerns likely bear on which party has the more reasonable view of the regulatory definition. It nonetheless remains that the definition of "intangible" could be construed as covering residual-business assets if the language of § 1.482-4(b) is viewed in isolation.[10]

B.

But we are required to look at the regulatory scheme "as a whole," viewing the regulatory "definition in the context of the entire [transfer pricing] regulations." *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. 2005). The Commissioner argues that other regulations governing transfer pricing support his view that the regulatory definition of an "intangible" embraces residual-business

---

[10] The Commissioner also argues that the definition of an "intangible" includes residual-business assets because an uncontrolled party would pay for access to those assets in an arm's length transaction. He cites the testimony of Amazon's expert that parties dealing at arm's length "[d]efinitely" pay for "growth options" because "[n]o company is going to give away something of value without compensation." The Commissioner's argument misses the mark. Under the regulations, the arm's length standard governs the *valuation* of intangibles; it doesn't answer whether an item *is* an intangible. The definition of an "intangible" is provided in § 1.482-4(b). The Commissioner points to no language in the statute or regulations suggesting that the definition of what constitutes an intangible is determined by asking whether an uncontrolled party would pay for it.

assets.  He cites two sections in the regulations, §§ 1.482-7A and 1.482-1.

Section 1.482-7A specifies the requirements of a qualified cost sharing arrangement and the methods for determining the taxable income resulting from such an arrangement.  The Commissioner cites the subsection that imposes the "buy-in" requirement where "[a] controlled participant . . . makes intangible property available to a qualified cost sharing arrangement."  Treas. Reg. § 1.482-7A(g)(1).  The Commissioner argues that this provision mandates that residual-business assets be paid for "if they are made 'available' to the cost-sharing participants" even though such assets generally cannot be transferred independently from the business.

The Commissioner's argument based on § 1.482-7A(g)(1) *presupposes* the very point he attempts to prove—that residual-business assets are "intangible property" within the meaning of the regulations.  The provision requiring a "buy-in" does not expand but instead incorporates the meaning of an "intangible" given in § 1.482-4(b).  *See* Treas. Reg. § 1.482-7A(g)(2) ("The buy-in payment by each such other controlled participant is the arm's length charge for the use of the *intangible* . . . ." (emphasis added)).  The "makes . . . available" language thus provides no meaningful insight into the regulatory definition of an "intangible."[11]

---

[11] Considered in context of the regulatory framework, it appears that the purpose of the "makes . . . available" phrasing in § 1.482-7A(g) is to account for taxpayers who might seek to avoid the requirements of the transfer pricing regulations by not formally *transferring* their intangible assets to a related party and instead informally *making available* the

The Commissioner also finds support for his position in the regulations' preamble stating that "[t]he purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions." Treas. Reg. § 1.482-1(a)(1).    Relying    on    *Xilinx, Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010), the Commissioner argues that "*anything* of value that is made available between related parties must be paid for" in the buy-in, regardless of whether it is defined as an intangible.

In *Xilinx*, we considered whether the parties to a cost sharing arrangement "must include the value of certain stock option compensation one participant gives to its employees in the pool of costs to be shared." *Id.* at 1192.  We found two provisions of the regulations in conflict.  We first cited § 1.482-1(b)(1)'s statement that "the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." *Id.* at 1195 (quoting Treas. Reg. § 1.482-1(b)(1)).  It was undisputed on appeal that unrelated parties would not have shared the employee stock option costs. *Id.* at 1194.  Another provision, however, required that "controlled parties in a cost sharing agreement . . . share *all* 'costs . . . related to the intangible development area,'" which by definition would include the employee stock options. *Id.* at 1196.  In resolving this conflict, the *Xilinx* majority affirmed the tax court's conclusion that the stock options need not be paid for as part of the buy-in. *Id.*

---

assets.  The regulations thus treat such taxpayers "as having transferred interests in such [intangible] property."  Treas. Reg. § 1.482-7A(g)(1).

at 1196–97.  The primary opinion reasoned that "[p]urpose
is paramount."  *Id.* at 1196.[12]

Relying on the logic of the primary opinion in *Xilinx*, the
Commissioner asserts that "it is undisputed that a company
entering into the same transaction under the same
circumstances with an unrelated party would have required
compensation."  To evaluate this claim, it's important to be
clear about what exactly is meant by the phrase "the same
transaction under the same circumstances."  The
Commissioner relies on deposition testimony from one of
Amazon's experts that parties dealing at arm's length would
pay for growth options.  But the expert explained at trial the
difference between an investor or purchaser of the entire
business (who would pay for the full value of the business)
and a partner (who would not).  The question becomes
whether a cost sharing arrangement is akin to the sale of a
business or like a partnership in certain assets or aspects of
the business.  The Commissioner assumes, but does not
explain why, the transfer of intangible assets under

---

[12] Caution should be taken before relying on the rationale of the
primary opinion in *Xilinx*.   One panel member concurred—thus
providing a majority vote for the disposition—but wrote separately "to
explain [his] particular reasons for rejecting the Commissioner's
position."  *Id.* at 1197 (Fisher, J., concurring).  Although the reasoning
of the concurring opinion overlaps somewhat with the reasoning of the
primary opinion, the concurrence does not seem to adopt the "[p]urpose
is paramount" logic.  Instead, based on the language of the regulations,
the legislative and regulatory history, international tax treaties, and the
understanding of the business community and tax professionals (i.e.,
amici curiae), the concurrence concluded that the taxpayer's
"understanding of the regulations is the more reasonable even if the
Commissioner's current interpretation may be theoretically plausible."
*Id.* at 1198.

Amazon's cost sharing arrangement with AEHT should be treated the same as the sale of the business.

The Commissioner's reliance on *Xilinx* thus suffers the same defect as his "made available" argument based on § 1.482-7A(g)—he assumes the very conclusion he's aiming to prove.   Although the regulatory provisions the Commissioner cites are consistent with his position, they do not provide independent support and they are likewise consistent with Amazon's view.

If the cost sharing regulations as a whole tip the scale either direction, they tend to favor Amazon on the issue presented here.   The regulations describe a cost sharing arrangement as an agreement "to share the costs of development of one or more intangibles."   Treas. Reg. § 1.482-7A(a)(1).   The written document memorializing the arrangement must, among other things, describe both "the scope of the research and development to be undertaken, including the intangible or class of intangibles intended to be developed." Treas. Reg. § 1.482-7A(b)(4)(iii).   The writing must also describe "each participant's interest in any covered intangibles," which is "any intangible property that is developed as a result of the research and development undertaken under the cost sharing arrangement."   Treas. Reg. § 1.482-7A(b)(4)(iv).   By identifying intangibles as being the product of R&D efforts, the regulations seem to contemplate a meaning of "intangible" that excludes items like goodwill and going concern value, which "are generated by earning income, not by incurring deductions."   Staff of J. Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 428 (Comm. Print 1984).

The overall regulatory scheme doesn't definitively resolve the issue, but it favors Amazon more than the Commissioner.

## C.

We next turn to the drafting history of the regulatory definition.  Both parties claim support for their respective positions in the historical development of the regulations.

Treasury first defined intangible property for purposes of section 482 in regulations adopted in 1968:

> [I]ntangible property shall consist of the items described in subdivision (ii) of this subparagraph, provided that such items have substantial value independent of the services of individual persons.
>
> (ii) The items referred to in subdivision (i) of this subparagraph are as follows:
>
>> (a) Patents, inventions, formulas, processes, designs, patterns, and other similar items;
>>
>> (b) Copyrights, literary, musical, or artistic compositions, and other similar items;
>>
>> (c) Trademarks, trade names, brand names, and other similar items;
>>
>> (d) Franchises, licenses, contracts, and other similar items;

> (e) Methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, estimates, customer lists, technical data, and other similar items.

33 Fed. Reg. 5848, 5854 (Apr. 16, 1968).

Fourteen years later, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982, adopting a definition of intangible property in section 936 of the Internal Revenue Code that was nearly identical to the one in the regulations implementing section 482.[13]  The Commissioner plucks a phrase from a Senate Report for the 1982 Act suggesting that the statute "defines intangible assets broadly."  With more context, the quoted sentence from the Senate Report states that "[t]he bill defines intangible assets broadly to include" the 28 specifically-listed items "and other items *similar to any of those listed*, so long as the item has substantial value independent of the services of individual persons."  S. Rep. 97-494, at 161 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 781, 924 (emphasis added).[14]

---

[13] The new statutory definition differed from the regulatory one in four, relatively minor respects: (1) making all enumerated items singular; (2) adding "know-how" to the first category; (3) inserting "any similar item" as a stand-alone category in lieu of "other similar items" in each category; and (4) requiring that an item have "substantial value independent of the services of any individual" rather than "of individual persons."  Tax Equity & Fiscal Responsibility Act of 1982, Pub. L. 97-248, § 213, 96 Stat. 324 (Sept. 3, 1982).

[14] Another part of the quoted Senate Report states that the Committee viewed the bill as combatting the practice of transferring intangibles "created, developed or acquired in the United States" to foreign entities to generate income tax-free. S. Rep. 97-494, at 158–59 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 781, 921–22.  It seems from

The Tax Reform Act of 1986 amended section 482 to incorporate the "intangible property" definition from section 936: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Pub. L. 99–514, § 1231, 100 Stat. 2085 (Oct. 22, 1986).

When it amended section 482, Congress requested that the IRS conduct "a comprehensive study of intercompany pricing rules" and report on whether the existing regulations "could be modified in any respect." H.R. Rep. No. 99-841, at II-637 (1986). The resulting IRS report, known as the "White Paper," laid the groundwork for what would ultimately become the 1994/1995 regulations. *A Study of Intercompany Pricing Under Section 482 of the Code*, I.R.S. Notice 88-123, 1988-2 C.B. 458.

The White Paper discussed, among other things, cost sharing arrangements. According to the White Paper, the purpose of the buy-in requirement is for "a party to a cost sharing arrangement that has contributed funds or incurred risks for development of intangibles at an earlier stage" to be "compensated by the other participants." *Id.* at 497. "[I]f there are intangibles that are not fully developed that relate to the research to be conducted under the cost sharing arrangement, it is necessary to value them in order to determine an appropriate buy-in payment." *Id.*

---

this language, the Committee didn't contemplate intangibles that are not independently transferrable.

The White Paper proposed "three basic types of intangibles" that would be subject to the buy-in requirement:

- "preexisting intangibles at various stages of development that will become subject to the arrangement";

- "basic research not associated with any product"; and

- "a going concern value associated with a participant's research facilities and capabilities that will be utilized."

*Id.* Although the White Paper proposed including going concern value of a research facility in the buy-in, after receiving opposition in public comments, Treasury proposed new regulations that essentially retained the definition of "intangible" from before without referencing going concern value or any other residual-business asset. *See* 57 Fed. Reg. 3571, 3579 (Jan. 30, 1992).

In 1993, Treasury issued revised temporary and proposed regulations that defined an "intangible" as "any commercially transferable interest" in the intangibles listed in § 936(h)(3)(B) that had "substantial value independent of the services of any individual." 58 Fed. Reg. 5263, 5287 (Jan. 21, 1993). Treasury also requested comment on "whether the definition of intangible property . . . should be expanded to include items not normally considered to be items of intellectual property, such as work force in place, goodwill or going concern value." 58 Fed. Reg. 5310, 5312 (Jan. 21, 1993). Amazon cites opposition comments submitted in response to Treasury's request for comment.

In 1994, Treasury issued final regulations (the ones applicable here), which reflected a minor reworking of the

definition.    59 Fed. Reg. 34971, 35016 (Jul. 8, 1994).
Treasury explained that the revised definition omitted the
"commercially transferrable" language that appeared in the
temporary regulations "because it was superfluous: if the
property was not commercially transferrable, then it could
not have been transferred in a controlled transaction."  *Id.*
at 34983.    Treasury also explained that the revision
"clarified" that the phrase "other similar items" in the
definition "refer[s] to items that derive their value from
intellectual content or other intangible properties rather than
physical attributes."  *Id.*   In 1995, Treasury issued final
regulations governing cost sharing arrangements, including
§ 1.482-7A(g)'s "buy-in" requirement.

The drafting history of the transfer pricing regulations
does not support the Commissioner's argument that the
definition of an "intangible" covered residual-business
assets.  The only references in the drafting history to any
residual-business assets suggest that such items were
excluded from the definition of intangible assets.  The IRS's
1988 White Paper proposed including "going concern value"
of a research facility in the buy-in, but Treasury's 1994/1995
regulations kept essentially the same definition as before
without referring to "going concern value" or any other
residual-business asset.  *See* 57 Fed. Reg. at 3579.

Two key statements by Treasury in the drafting history
render the Commissioner's current position untenable.  First,
in 1993, Treasury confirmed that the then-existing definition
of "intangible" did *not* include residual-business assets when
it asked for comments on whether the definition of
intangibles "should be *expanded* to include items not
normally considered to be items of intellectual property,
such as work force in place, goodwill or going concern
value."  58 Fed. Reg. at 5312 (emphasis added).  Second, a

year later after opting against such an expansion, and instead retaining the same essential definition from before (including the same list of 28 items), Treasury explained that the final (1994) rule merely "clarified" when an item would be deemed similar to the 28 items listed in the definition. 59 Fed. Reg. at 34983.

The Commissioner is thus forced to argue that what Treasury explicitly confirmed would *not* be considered an "intangible" without a substantive "expan[sion]" of the definition was implicitly added to the definition through a non-specific "clarifi[cation]." The Commissioner's argument stretches "clarification" beyond its commonly understood meaning of merely clearing up what was previously ambiguous or otherwise restating a standard consistent with what was previously intended. *Cf. Motorola, Inc. v. Fed. Exp. Corp.*, 308 F.3d 995, 1007 (9th Cir. 2002) (distinguishing between a "clarifying amendment" and "one that work[s] a substantive change" (emphasis omitted)).[15]

Another statement from the drafting history of § 1.482-4 lends further support for Amazon's position that "intangible" has always been understood to be limited to assets that are independently transferrable. Treasury's temporary regulations in 1993 defined an "intangible" as "any commercially transferable interest" in the intangibles listed in section 936(h)(3)(B) that had "substantial value independent of the services of any individual." 58 Fed. Reg. at 5287. When Treasury left out the "commercially

---

[15] Amazon and amici curiae also argue that if the Commissioner is correct that the non-specific "clarifi[cation]" of § 1.482-4(b)'s catchall substantively expanded the definition of an "intangible," then Treasury/IRS violated the Administrative Procedures Act. We need not address this argument because we reject the Commissioner's post hoc interpretation of the changes to the regulatory definition.

transferrable" language from the final regulations issued a year later, it explained that the omitted language was "superfluous" because "if the property was not commercially transferrable, then it could not have been transferred in a controlled transaction." 59 Fed. Reg. at 34983. This is consistent with the basic premise of the transfer pricing regulations, which contemplate a situation in which particular assets are *transferred* from one entity to another.

The Commissioner now contends that the 1994 definition was intended to embrace residual-business assets even though such assets "cannot be transferred independently." Yet the Commissioner fails to identify any contemporaneous statement by the agency that would "display awareness" that it was changing its position on whether residual-business assets are included within the definition of intangibles. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

The Commissioner argues his position is supported by a different regulatory scheme governing penalties for taxpayers who substantially misstate the value of property on their tax returns. *See* 26 U.S.C. § 6662(e). In 1993, Treasury proposed regulations "designed to encourage taxpayers to document their transfer pricing transactions and to provide that documentation to the [IRS] upon request." 58 Fed. Reg. 5304, 5304 (Jan. 21, 1993). To that end, the proposed regulations provided rules for determining whether a taxpayer has substantially misstated the value of property.

Those rules defined "property" to include "intangible property," which in turn was defined to include "property such as goodwill, covenants not to compete, leaseholds, patents, contract rights, debts, and choices in action." *Id.* at 5306.

The Commissioner's attempt to bootstrap § 1.6662-5's reference to "goodwill" ignores that the proposed regulation concerning substantial valuation misstatements was issued on the same day Treasury separately confirmed that the definition of "intangible" for purposes of the regulations implementing section 482 did *not* include goodwill or other residual-business assets. 58 Fed. Reg. at 5312. Considering the context, Treasury's use of "goodwill" in § 1.6662-5 but not in § 1.482-4(b) most likely evinces an intent *not* to include goodwill or other residual-business assets within § 1.482-4(b)'s definition of "intangible."

Amazon points to other Treasury regulations that define certain covered property by incorporating the definition of intangible property under section 936(h)(3)(B) and then adding goodwill and going concern value. Treas. Reg. §§ 1.954-2(e)(3)(iv), 1.861-9T(h)(1)(ii). These provisions add little to the discussion, but the express inclusion of goodwill and going concern value in these regulations is consistent with Amazon's position that the definition of "intangible" in section 936(h)(3)(B) and § 1.482-4(b) was understood to exclude goodwill and going concern value. These regulations also show that Treasury "clearly knew how to write its regulations" to include goodwill and other residual-business assets. *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1015–16 (9th Cir. 2017).

The drafting history of § 1.482-4(b) strongly supports Amazon's position that Treasury limited the definition of "intangible" to independently transferrable assets.[16]

## D.

The Commissioner next argues that the tax court should have deferred to the IRS's interpretation of its own regulations. Under certain circumstances, an agency's interpretation of its own regulations "must be given 'controlling weight'" if it is not "'plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States*, 508 U.S. 36, 45 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also Auer v. Robbins*, 519 U.S. 452, 461–62 (1997). This is frequently referred to as *Auer* deference.

The Supreme Court "has cabined *Auer*'s scope in varied and critical ways." *Kisor*, 139 S. Ct. at 2418. "First and foremost, a court should not afford *Auer* deference unless the

---

[16] In 2017, Congress amended the definition of "intangible property" in section 936(h)(3)(B). That amendment added "goodwill, going concern value, or workforce in place" to the list of specific items included in the definition of "intangible property." Tax Cuts & Jobs Act of 2017, Pub. L. 115-97, § 14221(a), 131 Stat. 2054, 2218 (2017). Characterizing the change as merely a "clarification," the Commissioner argues that the 2017 amendment supports his proffered interpretation of the 1994/1995 regulations. But the Commissioner's post-hoc label of Congress's amendment is not controlling, *see Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1186 (9th Cir. 2016) ("Post-hoc labeling as a 'clarification' by bill supporters of what otherwise appears to be a change . . . is not controlling . . . ."), and it's also not supported by Congress's own words. Congress stated that the amendment should not be "construed to create any inference" as to the definition of intangibles for taxable years occurring before the amendment's effective date. 131 Stat. at 2219. Congress said nothing to indicate that the amendment was meant only as a clarification.

regulation is genuinely ambiguous." *Id.* at 2415. Genuine ambiguity is not determined by examination of the regulatory text alone. Instead, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction," "'carefully consider[ing]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* (first quoting *Chevron*, 467 U.S. at 843 n.9; then quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting))).

The text of the regulatory definition of "intangible," the definition's place within the transfer pricing regulations generally, and the rulemaking history leave little room for the Commissioner's proffered meaning. But even if there were genuine ambiguity, there is a separate reason *Auer* deference is not warranted here.

"[N]ot every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference." *Kisor*, 139 S. Ct. at 2416. Instead, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). For example, courts will not defer to an agency's interpretation when doing so "would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1267 (9th Cir. 2015) (alteration in original) (quoting *Christopher*, 567 U.S. at 156). This exception accounts for the "risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrat[ing] the notice and predictability purposes of rulemaking.'"

*Christopher*, 567 U.S. at 158 (quoting *Talk Am., Inc. v. Michigan Bell Tel. Co.*, 564 U.S. 50, 68 (2011) (alteration in original) (Scalia, J., concurring)).

*Christopher* and *Barboza* thus teach that the timing of an agency's first announcement of its interpretation may be dispositive on whether the agency's view will be given *Auer* deference. Here, the Commissioner does not identify a specific document (e.g., policy manual or court brief) definitively expressing the agency's view of its regulations. It thus appears that the Commissioner's court briefs in this case present Treasury's "first announce[ment of] its view," *see Christopher*, 567 U.S. at 153, that the definition of intangible in § 1.482-4(b) embraces residual-business assets. The exception to *Auer* deference from *Christopher* and *Barboza* therefore applies. "Where an agency announces its interpretation for the first time in an enforcement proceeding, and has not previously taken any action to enforce that interpretation, 'the potential for unfair surprise is acute.'" *Barboza*, 799 F.3d at 1267 (quoting *Christopher*, 567 U.S. at 158). Even if first arising before the current litigation, a new interpretation is owed no deference if it would "create[] 'unfair surprise' to regulated parties." *Kisor*, 139 S. Ct. at 2417–18 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)). No statement from Treasury in the drafting history of the 1994/1995 regulations expresses the position the Commissioner advances now. Indeed, as discussed above, Treasury's contemporaneous explanations of the regulations are to the contrary. Amazon and other taxpayers were thus not given fair warning of the Commissioner's current interpretation of the regulatory definition of an "intangible." That interpretation is not entitled to deference.

IV.

The Commissioner's calculation of AEHT's buy-in under the cost sharing arrangement included residual-business assets as part of Amazon's pre-existing intangibles. The language of the (now-superseded) regulatory definition of an "intangible" is ambiguous and could be construed as including residual-business assets. But the drafting history of the regulations and other indicators of Treasury's contemporaneous intent strongly favor Amazon's proffered meaning—that intangibles were limited to independently transferrable assets. Treasury appears to have changed its position on the meaning of the regulation after Amazon and AEHT entered into their cost sharing arrangement. We share the sentiment reflected in the concurring opinion in *Xilinx*:

> Indeed, I am troubled by the complex, theoretical nature of many of the Commissioner's arguments trying to reconcile the two regulations. Not only does this make it difficult for the court to navigate the regulatory framework, it shows that taxpayers have not been given clear, fair notice of how the regulations will affect them.

*Xilinx*, 598 F.3d at 1198 (Fisher, J., concurring). We therefore agree with the tax court that the former regulatory definition of an "intangible" does not include residual-business assets.

**AFFIRMED**.