**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALTERA CORPORATION & SUBSIDIARIES, *Petitioner-Appellee*, v. COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellant.* | Nos. 16-70496 16-70497 Tax Ct. Nos. 6253-12 9963-12 ORDER |

Filed November 12, 2019

Before: Sidney R. Thomas, Chief Judge, and Susan P. Graber and Kathleen M. O'Malley,[*] Circuit Judges.

Order;
Dissent by Judge Milan D. Smith, Jr.

---

[*] The Honorable Kathleen M. O'Malley, United States Circuit Judge for the U.S. Court of Appeals for the Federal Circuit, sitting by designation.

## SUMMARY[**]

# Tax

The panel denied a petition for rehearing en banc on behalf of the court in a case in which the panel reversed the decision of the Tax Court.

Judge M. Smith, joined by Judges Callahan and Bade, dissented from the denial of rehearing en banc. Title 26 of United States Code § 482 authorizes the Department of Treasury to re-allocate reported income and costs between related entities where necessary to prevent them from improperly avoiding taxes. Judge M. Smith agreed with the Tax Court's unanimous conclusion that the Treasury's implementing regulation § 1.482-7(d)(2) constituted arbitrary and capricious rulemaking in violation of the Administrative Procedure Act. Judge M. Smith observed that, in addition to being wrongly decided, the majority's decision engenders deleterious practical consequences, threatens the uniform enforcement of the Tax Code, invites an effective circuit split, ignores the reasonable reliance of businesses on the well-settled arm's length standard and subjects those businesses to double taxation, lowers the bar for compliance with the Administrative Procedure Act, and sends a signal that executive agencies can bypass proper notice-and-comment procedures through post-hoc rationalization.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Arthur T. Catterall (argued), Richard Farber, Gilbert S. Rothenberg, and Francesca Ugolini, Attorneys; Travis A. Greaves, Deputy Assistant Attorney General; Richard E. Zuckerman, Principal Deputy Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellant.

Donald M. Falk (argued), Mayer Brown LLP, Palo Alto, California; Thomas Kittle-Kamp and William G. McGarrity, Mayer Brown LLP, Chicago, Illinois; Brian D. Netter, Travis Crum, and Nicole A. Saharsky, Mayer Brown LLP, Washington, D.C.; A. Duane Webber, Phillip J. Taylor, and Joseph B. Judkins, Baker & McKenzie LLP, Washington, D.C.; Ginger D. Anders, Munger Tolles & Olson LLP, Washington, D.C.; Mark R. Yohalem, Munger Tolles & Olson LLP, Los Angeles, California; for Petitioner-Appellee.

Susan C. Morse, University of Texas Law School, Austin, Texas; Stephen E. Shay and Allison Bray, Certified Law Students, Harvard Law School, Cambridge, Massachusetts; Clinton G. Wallace, Columbia, South Carolina; and Leandra Lederman, Bloomington, Indiana; for Amici Curiae Law Academics and Professors.

Jonathan E. Taylor, Gupta Wessler PLLC, Washington, D.C.; Clint Wallace, Vanderbilt Hall, New York, New York; for Amici Curiae Anne Alstott, Reuven Avi-Yonah, Lily Batchelder, Joshua Blank, Noel Cunningham, Victor Fleischer, Ari Glogower, David Kamin, Mitchell Kane, Sally Katzen, Edward Kleinbard, Michael Knoll, Rebecca Kysar, Zachary Liscow, Daniel Shaviro, John Steines, David Super, Clint Wallace, and George Yin.

Larissa B. Neumann, Ronald B. Schrotenboer, Kenneth B. Clark, Adam R. Gahtan, and Michael D. Knobler, Fenwick & West LLP, Mountain View, California, for Amicus Curiae Xilinx Inc.

Christopher J. Walker, The Ohio State University Moritz College of Law, Columbus, Ohio; Kate Comerford Todd, Steven P. Lehotsky, and Warren Postman, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

John I. Forry, San Diego, California, for Amicus Curiae TechNet.

Charles G. Cole, Alice E. Loughran, Michael C. Durst, Gregory N. Kidder, and Mark C. Savignac, Steptoe & Johnson LLP, Washington, D.C.; Bennett Evan Cooper, Steptoe & Johnson LLP, Phoenix, Arizona; Alexander Volokh, Emory University School of Law, Atlanta, Georgia; for Amici Curiae Software and Information Industry Association, Financial Executives International, Information Technology Industry Council, Silicon Valley Tax Directors Group, Software Finance and Tax Executives Counsel, National Association of Manufacturers, American Chemistry Council, BSA | the Software Alliance, National Foreign Trade Council, Biotechnology Innovation Organization, Computing Technology Industry Association, The Tax Council, United States Council for International Business, and Semiconductor Industry Association.

Kenneth P. Herzinger and Eric C. Wall, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Peter J. Connors, Orrick Herrington & Sutcliffe LLP, New York, New York; for Amici Curiae Charles W. Calomiris, Kevin H. Hassett, and Sanjay Unni.

Roderick K. Donnelly and Neal A. Gordon, Morgan Lewis & Bockius LLP, Palo Alto, California; Thomas M. Peterson, Morgan Lewis & Bockius LLP, San Francisco, California; Michelle L. Andrighetto, Morgan Lewis & Bockius LLP, Boston, Massachusetts; Justin McGough, 3M Company, Saint Paul, Minnesota; Karen Robinson, Vice President, Legal, Adobe Inc., San Jose, California; Theodore J. Boutrous Jr. and Christopher Chorba, Gibson Dunn & Crutcher LLP (for Apple Inc.), Los Angeles, California; Armin D. Eberhard, Director, International Tax Planning and M&A, Applied Materials, Santa Clara, California; Desiree Ralls-Morrison, SVP, General Counsel & Corporate Secretary, Boston Scientific Corporation, Marlborough, Massachusetts; Thomas J. Vallone, Senior Vice President, Global Tax, Dell Technologies Inc., Round Rock, Texas; Andy Sherman, Dolby Laboratories Inc., San Francisco, California; Aaron Johnson, VP Legal, eBay, San Jose, California; Jacob Schatz, EVP, General Counsel and Corporate Secretary, Electronic Arts Inc., Redwood City, California; Katie Lodato, Vice President – Global Tax, Eli Lilly and Company, Indianapolis, Indiana; Dana L. Lasley, Emerson Electric Co., St. Louis, Missouri; Paul S. Grewal, VP & Deputy General Counsel, Facebook Inc., Menlo Park, California; John Whittle, Executive Vice President, General Counsel, Fortinet, Sunnyvale, California; Christine Henninger, General Mills Inc., Golden Valley, Minnesota; Nora Puckett, Google LLC, Mountain View, California; Kyle Bonacum, GoPro Inc., San Mateo, California; Joshua Mishoe, Vice President, Hewlett Packard Enterprise Company, Plano, Texas; Barbara Beckerman, International Paper Company, Memphis, Tennessee; Michael R. Peterson, President and Corporate Secretary, Johnson Controls Inc.; Mark Casper, Vice President and Deputy General Counsel, Maxim Integrated, San Jose, California; Matthew Fawcett, General Counsel, NetApp Inc., Sunnyvale, California;

Margaret C. Wilson, Wilson Law Group LLC (for Oracle Corporation), Princeton, New Jersey; Maryanne Bifulco, Vice President, Transfer Pricing Counsel, PepsiCo Inc., Purchase, New York; Markus Green, Assistant GC, Government Relations/Litigation, Pfizer Inc., New York, New York; Lowell Yoder, McDermott Will & Emery (for Procter and Gamble Company), Chicago, Illinois; Beth Wapner, VP Tax, Qualcomm Incorporated, San Diego, California; Tanya Guazzo, S&P Global Inc., New York, New York; Russell Elmer, ServiceNow Inc., Santa Clara, California; Lora Blum, General Counsel, SurveyMonkey, San Mateo, California; Scott C. Taylor, EVP, General Counsel & Secretary, Symantec Corporation, Mountain View, California; Donald P. Lancaster, United Parcel Service Inc., Atlanta, Georgia; Lisa McFall, VP & Deputy General Counsel, Workday Inc., Pleasanton, California; for Amicus Curiae Cisco Systems Inc. and Thirty-Two Other Affected Companies.

Christopher Bowers, David Foster, Raj Madan, and Royce Tidwell, Skadden Arps Slate Meagher & Flom LLP, Washington, D.C.; Nathaniel Carden, Skadden Arps Slate Meagher & Flom LLP, Chicago, Illinois; for Amicus Curiae Amazon.com Inc.

Miriam L. Fisher, Melissa Arbus Sherry, and Eric J. Konopka, Latham & Watkins LLP, Washington, D.C., for Amici Curiae PricewaterhouseCoopers LLP, Deloitte Tax LLP, and KPMG LLP.

## **ORDER**

The full court has been advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. Judges McKeown, Wardlaw, Bybee, Bea, Watford, Owens, Friedland, Miller, Collins, and Lee were recused and did not participate in the vote.

The petition for rehearing en banc is denied. Attached is the dissent from and statements respecting the denial of rehearing en banc.

---

M. SMITH, Circuit Judge, with whom CALLAHAN and BADE, Circuit Judges, join, dissenting from the denial of rehearing en banc:

Neither the laudable goal of preventing tax evasion nor the prospect of adding billions of dollars to the public coffers excuses the Department of the Treasury from complying with the Administrative Procedure Act. In 2003, Treasury promulgated a tax rule with no reasoned basis for its decision, pursuant to an explanation that ran contrary to the evidence before it. In 2019, a divided panel of our court upheld that rule based on a novel interpretation of the relevant statute, which Treasury developed only as an appellate litigating position, and which was never subject to notice and comment. As recognized by the unanimous en banc Tax Court, Treasury's actions in this case are the epitome of arbitrary and capricious rulemaking. The panel majority's decision tramples on the reliance interests of American businesses, threatens the uniform enforcement of

the Tax Code, and drastically lowers the bar for compliance with the Administrative Procedure Act.

I respectfully dissent from our court's denial of rehearing en banc.[1]

## I.

For almost a century, Congress has authorized Treasury to recalculate the taxes of related entities based on what their taxes would look like if they were unrelated entities. For the past fifty years, Treasury has made this determination by analyzing whether the results of a transaction between related entities are consistent with the results of a comparable transaction between entities operating at arm's length. When a transaction does not meet this arm's length standard, Treasury adjusts it for tax purposes by re-allocating the related entities' costs and income.

In the late-1990s, Treasury decided that stock-based compensation—then a new phenomenon—was a type of cost it wanted to re-allocate under these calculations. The problem was, and remains, that unrelated entities do not share stock-based compensation costs. Treasury's first attempt at such a re-allocation was therefore thrown out by the Tax Court and by this court because it was contrary to Treasury's own regulations calling for application of the arm's length standard. Perhaps preemptively recognizing this defect on the very face of its rules, Treasury attempted a mid-litigation cure of simply adding a cross reference to its

---

[1] Judges McKeown, Wardlaw, Bybee, Bea, Watford, Owens, Friedland, Miller, Collins, and Lee were recused from consideration of en banc rehearing in this matter.

arm's length standard provision. That attempted cure is the 2003 rulemaking challenged here.

## A.

In 1928, Congress enacted 26 U.S.C. ("I.R.C.") § 482 to authorize Treasury to re-allocate reported income and costs between related entities where necessary to prevent them from improperly avoiding taxes by, for instance, shifting income to lower tax foreign jurisdictions. *See* H.R. Rep. No. 70-2, at 16–17 (1927); *Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972). Treasury soon promulgated regulations specifying that "[t]he standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Treas. Reg. 86, art. 45-1(b) (1935).[2]

In 1968, Treasury promulgated regulations specific to "qualified cost-sharing arrangements" (QCSAs)[3], such as the research and development agreement at issue in this case. *See* 33 Fed. Reg. 5848 (April 16, 1968). Treasury required that, "[i]n order for the sharing of costs and risks to be considered on an arm's length basis, the terms and conditions must be comparable to those which would have

---

[2] An "uncontrolled" taxpayer is distinguished from a "controlled" taxpayer, defined as "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, . . . includ[ing] the taxpayer that owns or controls the other taxpayers." Treas. Reg. § 1.482–1(i)(5).

[3] Designation of a cost-sharing agreement as a QCSA allows participating entities to share the costs of developing intangible property without incurring partnership taxation, and without any foreign participants incurring taxes for doing business in the United States. Treas. Reg. § 1.482-7A(a)(1).

been adopted by unrelated parties similarly situated had they entered into such an arrangement." *Id.* at 5854. The arm's length standard thus requires an "essentially and intensely factual" inquiry that looks to comparable transactions between non-related entities to ensure tax parity. *Procacci v. Comm'r*, 94 T.C. 397, 412 (1990).

In 1986, Congress amended § 482 to address the valuation of *transfers* of intangible property,[4] providing that "[i]n the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." I.R.C. § 482. This amendment appeared to introduce a new standard for allocating costs—a "commensurate with income" standard—which might have constituted a departure from the traditional arm's length analysis. But soon after, in 1988, Treasury dispelled such notions by publishing what came to be known as the "White Paper." *See A Study of Intercompany Pricing Under Section 482 of the Code*, I.R.S. Notice 88-123, 1988-2 C.B. 458. The phrase "arm's length standard" appears throughout the White Paper, which reiterated that "intangible income *must be allocated on the basis of comparable transactions* if comparables exist." *Id.* at 474 (emphasis added). In short, although the amended § 482 referenced a seemingly unfamiliar "commensurate with income" standard, the

---

[4] At the time the regulation challenged in this case was promulgated, "intangible property" was defined by a list of items that included any "patent, invention, formula, process, design, pattern, or know-how," "copyright," "trademark," "license," and so forth. I.R.C. § 936(h)(3)(B) (1996). In 2017, Congress amended the definition to include "goodwill, going concern value, . . . workforce in place," and other items whose value is "not attributable to tangible property or the services of any individual." I.R.C. § 367(d)(4).

White Paper emphasized that "Congress intended no departure from the arm's length standard"—which is to say, an analysis based on comparability. *Id.* at 475.[5]

## B.

In 1995, Treasury promulgated a regulation requiring participants in a QCSA to share "all of the costs" of developing intangibles. Treas. Reg. § 1.482-7(d)(1) (1995). Beginning in 1997, Treasury interpreted stock-based compensation to be such a cost. *See Xilinx, Inc. v. Comm'r*, 598 F.3d 1191, 1193–94 (9th Cir. 2010).

Xilinx, Inc. challenged this interpretation, and the Tax Court ruled in Xilinx's favor. *Xilinx, Inc. v. Comm'r*, 125 T.C. 37, 62 (2005). The Tax Court found as a factual matter that "two unrelated parties in a cost sharing agreement would not share any costs related to [stock-based compensation]." *Xilinx*, 598 F.3d at 1194. At the same time, it found that Treas. Reg. § 1.482-1(b)(1)—i.e., the arm's length standard—still controlled over Treasury's new all costs regulation. *Id.* It therefore found Treasury's re-

---

[5] Significantly, Congress prompted the creation of the White Paper *at the same time* it added the "commensurate with income" standard to § 482. *See* H.R. Rep. No. 99-841, at 637–38 (1986) (Conf. Rep.), *as reprinted in* 1986 U.S.C.C.A.N. 4075, 4725–26. Specifically, Congress "believe[d] that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given to whether the existing regulations could be modified in any respect." *Id.* at 638, *as reprinted in* 1986 U.S.C.C.A.N. at 4726. The resulting study—the White Paper—clearly stated that "the commensurate with income standard is fully consistent with the arm's length principle," and that "intangible income must be allocated on the basis of comparable transactions if comparables exist." 1988-2 C.B. at 458, 474.

allocation of Xilinx's stock-based compensation costs to be arbitrary and capricious. *Id.*

Our court affirmed the Tax Court, noting that the "purpose of the regulations is parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions," which is determined "based on how parties operating at arm's length would behave." *Id.* at 1196. Because Treasury "d[id] not dispute" that "unrelated parties would not share [stock-based compensation]," we concluded that Treasury could not require related parties to share it. *Id.* at 1194, 1196. We therefore found the all costs provision inoperative.

In his concurrence, Judge Fisher noted that Treasury's defense of the all costs provision relied on a rationale "not clearly articulated . . . until" the commencement of litigation. *Id.* at 1198 (Fisher, J., concurring). Judge Fisher was "troubled by the complex, theoretical nature of many of [Treasury's] arguments . . . . Not only does this make it difficult for the court to navigate the regulatory framework, it shows that taxpayers have not been given clear, fair notice of how the regulations will affect them." *Id.*[6]

---

[6] Judge Reinhardt dissented, finding instead that the paramount purpose of the regulations is preventing tax avoidance, and noting that tax law is not always fair or reasonable to businesses. *Id.* at 1199–1200 (Reinhardt, J., dissenting). Judge Reinhardt would have resolved the case in favor of Treasury by holding that the specific all costs provision (i.e. specifically addressing QCSAs) takes precedence over the general arm's length standard. *Id.* at 1199.

Judge Reinhardt also sat on the original panel in this case. *See Altera Corp. v. Comm'r*, No. 16-70496, 2018 WL 3542989 (9th Cir. July 24, 2018), *withdrawn*, 898 F.3d 1266 (9th Cir. 2018). There he concurred with the majority, again in favor of Treasury, but on the

## C.

In 2003, while the *Xilinx* litigation concerning the 1995 regulation was pending, Treasury published a rule codifying its decision that QCSA parties should share stock-based compensation costs.  To achieve this, Treasury updated the arm's length standard provision, Treas. Reg. § 1.482-1, with a cross-reference to its 1995 "all of the costs" provision, *id.* § 1.482-7,[7] and specifically defined "operating expenses" thereunder to include stock-based compensation, *id.* § 1.482-7(d)(2).    Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171, 51,178 (Aug. 26, 2003). Treasury purported to "believe that requiring stock-based compensation to be taken into account for purposes of QCSAs is consistent with the legislative intent underlying section 482 and with the arm's length standard," because "unrelated parties entering into QCSAs would generally share stock-based compensation costs."  *Id.* at 51,173.

## II.

During the 2004–2007 taxable years, Appellee Altera Corporation (Altera) shared certain costs with one of its foreign subsidiaries, Altera International, pursuant to a research and development cost-sharing agreement.  Relying

---

ground that the meaning of the arm's length standard is so fluid as to permissibly encompass the all costs method.  That opinion, published four months after Judge Reinhardt passed away, was ultimately withdrawn.  *Yovino v. Rizo*, 139 S. Ct. 706, 707 n.* (2019) (per curiam); *see id.* at 710 ("[F]ederal judges are appointed for life, not for eternity."). The majority opinion of the reconstituted panel essentially adopted the reasoning of the original panel.

[7] Subsequent to the 2003 amendments at issue, the Treasury Regulations have been re-organized and Treas. Reg. § 1.482-7 is now § 1.482-7A.

on the Tax Court's 2005 decision in *Xilinx*, the companies did not share the costs of stock-based compensation. After Altera filed consolidated income tax returns for these years, Treasury issued notices of deficiency on the grounds that it had to re-allocate over $100 million in income from Altera International to Altera to account for the unshared costs of stock-based compensation. Treasury asserted that this re-allocation was necessary under Treas. Reg. § 1.482-7(d)(2). Altera timely filed petitions in the Tax Court.

## A.

In a unanimous 15–0 decision, the Tax Court agreed with Altera and concluded that the regulation is arbitrary and capricious. *Altera Corp. v. Comm'r*, 145 T.C. 91, 133–34 (2015). The Tax Court determined that, during the rulemaking process, Treasury specifically justified its new stock-based compensation rule on the ground that it "was required by—or was at least consistent with—the arm's-length standard." *Id.* at 121 & n.17 (citing 68 Fed. Reg. at 51,173 ("The final regulations provide that stock-based compensation must be taken into account in the context of QCSAs because such a result is consistent with the arm's length standard.")). By contrast, the Tax Court found that Treasury did *not* rely on § 482's "commensurate with income" language, nor could this language sustain an inconsistent rule in any event given Congress's intent for it to work "consistently with the arm's-length standard." *Id.* (citing White Paper at 472, 475).

The Tax Court therefore proceeded to analyze whether Treasury had articulated a reasoned basis for its conclusion that "unrelated parties entering into QCSAs would generally share stock-based compensation costs." *Id.* at 123 (citing 68 Fed. Reg. at 51,173). It found that the administrative record contained no empirical data supporting such a

conclusion, that Treasury had made no attempt to search for evidence supporting such a conclusion, and that Treasury was unaware of any actual transaction illustrating such a result. *Id.* at 122–23. To the contrary, the Tax Court noted that Treasury "seemed to accept the commentators' economic analyses, which concluded that . . . unrelated parties to a QCSA would be unwilling to share the exercise spread or grant date value of stock-based compensation." *Id.* at 131. The Tax Court therefore found that "Treasury's 'explanation for its decision . . . runs counter to the evidence before' it." *Id.* (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). It further concluded that "Treasury's '*ipse dixit* conclusion, coupled with its failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking.'" *Id.* at 134 (quoting *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997)).

**B.**

Treasury appealed, and a divided panel of this court reversed. *Altera Corp. v. Commissioner*, 926 F.3d 1061, 1087 (9th Cir. 2019). On appeal, Treasury adopted a new position: that its 2003 rule was justified not because unrelated parties would *actually* share costs in the manner the rule now specifies, but because Treasury no longer needs to consider the behavior of unrelated parties at all. Treasury's new theory is that it can allocate costs under a QCSA based on a standard purely internal to the participants, with no analysis of comparable transactions between unrelated entities, and call this an arm's length result. The majority, applying *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), found that this revised interpretation of § 482 is permissible.

*Altera*, 926 F.3d at 1075–78. It further concluded that "Treasury's decision to do away with analysis of comparable transactions" was neither arbitrary nor capricious, because it "was made clear enough by citations to legislative history in the notice of proposed rulemaking and in the preamble to the final rule." *Id.* at 1082. Because Treasury abandoned the comparability standard, the majority explained, it was not required to address public comments that emphasized the absence of stock-based compensation cost-sharing in comparable transactions. *Id.*

Judge O'Malley dissented, noting that "Treasury repeatedly recognized that I.R.C. § 482 requires application of an arm's length standard when determining the true taxable income of a controlled taxpayer," and "just as consistently asserted that a comparability analysis is the only way to determine the arm's length standard." *Id.* at 1087 (O'Malley, J., dissenting). She concluded that Treasury could not depart from this well-settled rule using only "a justification Treasury never provided [during the rulemaking process] and one which does not withstand careful scrutiny." *Id.* Judge O'Malley further concluded that the regulation is arbitrary and capricious; that the regulation would be impermissible under *Chevron* even if Treasury had not erred procedurally; and that, because the regulation is invalid, our decision in *Xilinx* controls. *Id.* at 1092–1101.

## III.

Under the APA, we must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's rule is arbitrary and capricious when it "offer[s] an explanation for its decision that runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43. "The reviewing court should not attempt

itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). As recently emphasized by the Supreme Court, "[w]e cannot ignore [a] disconnect between the decision made and the explanation given. Our review is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

## A.

By its own account, Treasury's 2003 rulemaking was an attempted application of the traditional arm's length standard. Reviewing the 2003 rule on this basis, as we must, Treasury acted arbitrarily and capriciously because its "explanation for its decision [ran] counter to the evidence before" it. *State Farm*, 463 U.S. at 43.

Treasury's explanation for its decision during the rulemaking process was that allocating stock-based compensation costs was justified because "unrelated parties entering into QCSAs would generally share stock-based compensation costs." 68 Fed. Reg. at 51,173. Treasury considered this relevant because "[t]he regulations relating to QCSAs have as their focus reaching results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development of high-profit intangibles." *Id.* Treasury asserted that "[p]arties dealing at arm's length in [a QCSA] based on the sharing of costs and benefits generally would not distinguish between stock-based compensation and other forms of compensation." *Id.* In conclusion, Treasury emphasized that "[t]he final regulations provide that stock-based

compensation must be taken into account in the context of QCSAs *because* such a result is consistent with the arm's length standard." *Id.* (emphasis added).

As the unanimous Tax Court rightly concluded, Treasury's stated reasons for concluding that the sharing of stock-based compensation costs was required by the arm's length standard were belied by the evidence. *Altera*, 145 T.C. at 131. Treasury "fail[ed] to cite any evidence supporting its belief that unrelated parties to QCSAs would share stock-based compensation costs," commentators submitted "significant evidence . . . showing that unrelated parties to QCSAs would not share stock-based compensation costs," and Treasury "fail[ed] to respond to much of the submitted evidence." *Id.* As a result, the administrative record contained no empirical data supporting Treasury's conclusion. *Id.* at 122–23. Indeed, Treasury had made no attempt to search for evidence supporting its conclusion, and was unaware of any actual transaction in which unrelated parties had shared stock-based compensation costs. *Id.*

This "disconnect between the decision made and the explanation given" requires that we vacate Treasury's rule as arbitrary and capricious. *Dep't of Commerce*, 139 S. Ct. at 2575. This should be the end of our analysis.

## B.

The panel majority's opinion impermissibly upholds the 2003 rule based on a host of rationales and interpretive maneuvers amounting to "a [purportedly] reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quoting *Chenery*, 332 U.S. at 196).

At no point in Treasury's 2003 rulemaking did it make a finding, let alone one subject to notice and comment, that comparable transactions are per se unavailable for QCSAs, such that other methods must be employed in the first instance. *See Altera*, 926 F.3d at 1077–78, 1083 n.9 (majority opinion) (using legislative history and Treasury's one-sentence rejection of comparables submitted by commenters to draw this conclusion). At no point in Treasury's 2003 rulemaking did it announce that it was returning to a pre-1968 interpretation of § 482 subjecting taxpayers to an unpredictable "fair and reasonable" standard. *See id.* at 1068–69, 1078 (using caselaw from "most of the twentieth century," i.e., before Treasury promulgated more specific regulations in 1968, to justify this return). At no point in Treasury's 2003 rulemaking did it interpret the commensurate-with-income standard to provide an independent justification for its treatment of stock-based compensation. *See id.* at 1077 (using legislative history alone to infer this justification). And at no point in Treasury's 2003 rulemaking did it reverse its longstanding interpretation of the commensurate-with-income standard as consistent with the traditional arm's length standard. *See id.* at 1077, 1081 (deriving a disparate interpretation of the commensurate-with-income standard from whole cloth and relying on Treasury's insertion of a cross-reference to conclude that these newly disparate standards were appropriately "synthesize[d]").

The panel majority ignores Treasury's clear statements in the preamble to its 2003 rule expressly justifying its treatment of stock-based compensation based on a traditional arm's length analysis employing (unsubstantiated) comparable transactions. *See* 68 Fed. Reg. at 51,173. The panel upholds the rule only by accepting Treasury's convenient litigating position on appeal that it

permissibly jettisoned the traditional arm's length standard altogether. *See Altera*, 926 F.3d at 1077. By re-writing the reasoning supporting the rule, the majority renders extensive comments irrelevant, and is strangely untroubled by the idea that no member of the tax community noticed this alternative reasoning or submitted a relevant comment. *See id.* at 1081–82; *cf. Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) ("I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night.") (quoting *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 602 (1980) (Rehnquist, J., dissenting)).

The APA does not allow an agency to reclassify the reasoning it articulated to the public as "extraneous observations," Appellant's Br. at 64, ignore public comments pointing out the failures in such reasoning, and then defend its rule in litigation using reasoning the public never had notice of. Yet that is precisely what the majority's opinion allows Treasury to do.

## C.

Even if an agency could force the public to engage in a "scavenger hunt" for "cryptic" references in order to understand its reasoning in the ordinary rulemaking case, *Altera*, 926 F.3d at 1087–88 (O'Malley, J., dissenting), the APA would prohibit Treasury from doing so here:

> When an agency changes its existing position, it "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." But the agency must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy." In explaining its changed position,

> an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account."

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (citations omitted) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

In contrast to its statements during the 2003 rulemaking and before the Tax Court, Treasury no longer disputes that stock-based compensation costs cannot be re-allocated under the traditional arm's length standard. A legitimate rule requiring the sharing of stock-based compensation costs would therefore have necessitated a *change in position* regarding the type of standard permissibly employed under § 482. The relevant Supreme Court precedents call us to be particularly vigilant in ensuring that Treasury provided fair notice of this change in position. *See id.* It did not.

The majority opinion assumes away this problem by relying on legislative history from the 1986 amendment, making it seem as though the necessary interpretation of § 482 had been on the books for nearly twenty years before the 2003 rule. *See Altera*, 926 F.3d at 1085–86 (majority opinion). But Treasury expressly disclaimed the majority's interpretation of the 1986 amendment in the 1988 White Paper. White Paper at 472. The interpretation of § 482 on the books in 2003 was the traditional arm's length standard. Therefore, even if Treasury had articulated a permissible re-interpretation of § 482 in its 2003 rule, its failure to acknowledge the newness of this interpretation, let alone to consider the "serious reliance interests" engendered by the previous interpretation, would supply an independent reason

to vacate the rule.  *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox*, 556 U.S. at 515).

## IV.

The majority opinion additionally errs by accepting the interpretation of § 482's commensurate-with-income provision that Treasury now advocates.  Treasury's interpretation is not entitled to deference, and it conflicts with the plain language of the statute.

## A.

"[A] court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (citing *United States v. Mead Corp.*, 533 U.S. 218, 229–31, 236–37 (2001)).  For example, "*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation."  *Encino Motorcars*, 136 S. Ct. at 2125.  As demonstrated above, Treasury's 2003 rule was procedurally defective because its "explanation for its decision [ran] counter to the evidence before" it. *State Farm*, 463 U.S. at 43.  Even had it articulated a reasoned basis for its rule, it failed to "display awareness that it [was] changing position."  *Fox*, 556 U.S. at 515.  "An arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference."  *Encino Motorcars*, 136 S. Ct. at 2126.

Moreover, Treasury did *not* articulate a reasoned basis for its rule during notice-and-comment rulemaking, but rather attempts to do so now in its briefing on appeal. "Deference to what appears to be nothing more than an

agency's convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988); *cf. Kisor*, 139 S. Ct. at 2417–18 ("[A] court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.' And a court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties. That disruption of expectations may occur when an agency substitutes one view of a rule for another." (citations and footnote omitted) (first quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012), then quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007))). A litigating position is not "promulgated in the exercise of [Congressionally delegated] authority," *Mead*, 533 U.S. at 227, because it is not adopted "through any 'relatively formal administrative procedure,'" *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 827 (9th Cir. 2012) (en banc) (quoting *Mead*, 533 U.S. at 230). Rather, an agency's litigating position can "ordinarily [be] change[d] . . . from one case to another" via "internal decisionmaking not open to public comment or determination." *Id.* at 827, 830; *cf. Xilinx*, 598 F.3d at 1198 (Fisher, J., concurring) ("Not only do[]" Treasury's "complex, theoretical" litigating arguments "make it difficult for the court to navigate the regulatory framework, it shows that taxpayers have not been given clear, fair notice of how the regulations will affect them."). Nor is there any indication that Treasury's litigating position here "is one of long standing" or the product of "careful consideration . . . over a long period of time," *Barnhart v. Walton*, 535 U.S. 212, 221–22 (2002), seeing as how Treasury did not even make the same argument to the Tax Court in this matter.

Though some amici suggest it could, Treasury does not ask for *Auer* deference to its interpretation of Treas. Reg. § 1.482-1 (the arm's length standard). *See Auer v. Robbins*, 519 U.S. 452 (1997). Given the very detailed limitations on *Auer* deference spelled out in *Kisor*, virtually none of which Treasury's actions satisfy, it is clear that such deference would not be available even if not disclaimed. *See* 139 S. Ct. at 2415–18 (*e.g.*, generally does not apply to "an agency construction 'conflict[ing] with a prior' one," *id.* at 2418 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994))).

Even *Skidmore* deference is likely inappropriate here, where "billions of dollars" are at stake. *King v. Burwell*, 135 S. Ct. 2480, 2488–89 (2015) (finding *Chevron* inapplicable and making no mention of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

## B.

Setting aside whether Treasury's new interpretation of the commensurate-with-income standard obeys Treasury's own determination that Congress intended it to work "consistently with the arm's length standard," White Paper at 472, 475, the commensurate-with-income provision simply does not apply to QCSAs.

By its terms, the provision is applicable only if QCSAs constitute "transfers of intangible property." I.R.C. § 482. They do not. The majority opinion focuses on the breadth of the word "transfers," modified by "any," to conclude that transfers of future distribution rights fall within the provision's ambit. *Altera*, 926 F.3d at 1076. This reasoning suffers from two defects. First, QCSAs do not involve a transfer of future distribution rights. Treasury itself characterized QCSAs as "cost sharing arrangements *for the*

*development of* high-profit intangibles." 68 Fed. Reg. at 51,173 (emphasis added). "No rights are transferred when parties enter into an agreement to *develop* intangibles; this is because the rights to later-developed intangible property would spring *ab initio* to the parties who shared the development costs without any need to transfer the property." *Altera*, 926 F.3d at 1098 (O'Malley, J. dissenting). Second, the statutory definition of "intangible property" comprises a list of property types that *currently* exist, none of which resembles *future* distribution rights. *See supra*, note 4; I.R.C. § 936(h)(3)(B) (1996).[8]

The panel majority's application of the commensurate-with-income standard to Altera's QCSA was therefore incorrect. Even "under *Chevron*, the agency's reading must fall 'within the bounds of reasonable interpretation.' And let there be no mistake: That is a requirement an agency can fail." *Kisor*, 139 S. Ct. at 2416 (citation omitted) (quoting *Arlington v. FCC*, 569 U.S. 290, 296 (2013)).

## V.

In addition to being wrongly decided, the panel majority's decision engenders particularly deleterious practical consequences.

---

[8] The majority's discussion of future commodities, *Altera*, 926 F.3d at 1076 (majority opinion), is particularly off the mark given that such futures are excluded from the definition of intangible property as having value "attributable to tangible property." I.R.C. § 367(d)(4)(G). The majority's assertion that *stock-based compensation* is a transferred intangible under a QCSA only further confuses the point. *See id.* Treasury is attempting to re-allocate Altera's income in this case precisely because the parties did *not* transfer any stock-based compensation costs.

First, the majority opinion will likely upset the uniform application of the challenged regulation in the Tax Court, producing a situation akin to a circuit split. Although the Tax Court "will follow the clearly established position of a Court of Appeals to which a case is appealable," it "will give effect to [its] own views in cases appealable to courts that have not yet decided the issue." *Mitchell v. Comm'r*, 106 T.C.M. (CCH) 215, 220 n.7 (2013); *cf. Fehlhaber v. Comm'r*, 94 T.C. 863, 867 (1990) (disagreeing with a reversal by the Ninth Circuit and adhering to its position in cases outside the Ninth Circuit). The Tax Court determined unanimously, in a 15–0 decision, that Treasury's 2003 rulemaking "epitomize[d] arbitrary and capricious decisionmaking.'" 145 T.C. at 134 (quoting *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997)). This uncommon unanimity and severity of censure strongly suggest that the Tax Court will continue to be persuaded by its original reasoning. If so, the tax treatment of stock-based compensation costs will turn on the happenstance of where a business is located and create incentives to locate or incorporate elsewhere. Such a possibility is particularly problematic in the context of federal taxation, given that "[a] cardinal principle of Congress in its tax scheme is uniformity." *United States v. Gilbert Assocs., Inc.*, 345 U.S. 361, 364 (1953). In the meantime, businesses lack certainty regarding the meaning of the arm's length standard outside the Ninth Circuit.

Second, the panel majority's opinion tramples on the longstanding reliance interests of American businesses. *See* Appellee's Petition for Rehearing En Banc at 1–2, App'x C 1–4 (listing 56 companies that "noted the *Altera* issue in their annual reports (Forms 10-K) to the SEC," ranging from Alphabet Inc., reporting $4.4 billion at stake, to Groupon, Inc., reporting $14 million at stake). "Courts properly have

been reluctant to depart from an interpretation of tax law which has been generally accepted when the departure could have potentially far-reaching consequences." *Comm'r v. Greenspun*, 670 F.2d 123, 126 (9th Cir. 1982) (quoting *United States v. Byrum*, 408 U.S. 125, 135 (1972)).

Finally, as numerous amici observe, the panel majority opinion upsets not only domestic tax law, but international tax law as well. The allocation of income between related entities operating in different countries is a problem that must be addressed not only by Treasury and the IRS, but also by the relevant foreign tax agencies. In order to avoid double taxation, and pursuant to tax treaties negotiated by the United States, the arm's length method is "used by all major developed nations." *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 305 (1994). The panel majority's interpretation of § 482 as allowing for the use of a *purely internal* standard to make cost and income allocations, i.e., without ever inquiring as to the behavior of parties *operating at arm's length*, greatly upsets this international uniformity.

\* \* \*

Treasury justified its 2003 rule as an application of the traditional arm's length standard. Without searching for any evidence, it assumed it knew what comparable transactions would look like. Without any real analysis, it dismissed comments providing contrary examples. The en banc Tax Court unanimously, and rightly, invalidated the rule as arbitrary and capricious because Treasury's explanation for its decision ran counter to the evidence before it. Only before this court did Treasury conjure a new justification for the rule, not only newly applying the commensurate-with-income provision of the statute, but also newly interpreting that provision to bypass the traditional arm's length standard.

The panel majority was wrong to accept this justification, both procedurally and substantively.  Its decision invites an effective circuit split, ignores the reasonable reliance of businesses on the well-settled arm's length standard, subjects those businesses to double taxation, and sows uncertainty over the fate of billions of dollars. Moreover, its endorsement of Treasury's arbitrary and capricious rulemaking sends a signal that executive agencies can bypass proper notice-and-comment procedures as long as they come up with a clever post-hoc rationalization by the time their rules are litigated.

I respectfully dissent from the denial of rehearing en banc.